I am Lowell Sergel from the Department of Justice, representing the Secretary of Agriculture, and I'll try to watch my clock and reserve three minutes for rebuttal. This appeal concerns a 2014 amendment to the Federal Crop Insurance Program. That program allows farmers to purchase insurance from the government for expected crop yields. That expected yield is calculated by taking a historical average of historical yields divided by the number of planted acres. So what the 2014 amendment allowed, it allowed producers to exclude from that calculation certain uncharacteristically low yield crop years. So significantly, the data that was needed to make that calculation didn't exist at the time the 2014 amendment was enacted by Congress. Rather, the agency had to generate that data, and in addition, the agency also had to prioritize how it was going to address that, as well as take into account a number of provisions of the 2014 act that express implementation deadlines on other provisions. This particular provision was silent on the implementation deadline. Let me ask you a question about your statement that the data didn't exist on the low crop years. Is it that it didn't exist or that your agency hadn't previously collected that data, or is it that it wasn't collected in reference to this specific program? So this is addressed at page 46 of the appendix. It's Undersecretary Skew's statement, and he says that the yield data did not exist for some years. It just wasn't there at all. So what the agency had to do was decide what they were going to do about that, and one of the options would be to impute a number for that year based on some kind of calculation. Which ultimately you had to do. I mean, if it wasn't there, it wasn't there, whether you figured it out today or last year. Right, so it wasn't there, but what the agency had to do was make a policy judgment for what it was going to do. Sure. So what do you do for that missing data? And they have to decide how to make that judgment in an actuarially sound manner, because this program, of course, is not a handout program. The program was supposed to be self-supporting. The agency is supposed to set premiums so that it will cover all of the expected payments. So, and again, a number of the other provisions of the bill did have express implementation deadlines, and because of this, the agency was not able to generate these numbers for the 2015 year for winter wheat producers. What's the rule on implementation when there's no express deadline? Is it your position that when there's no express deadline, you can do it whenever you get around to it, or is it that it's effective immediately? So the rule is, I think, in this case, our basic position is that it would, because where it would have been impossible for the agency to implement it immediately, then the court should assume that Congress would not have intended that. Well, let's talk about that for a minute, though, because it's not impossible. I mean, you said you had to make priority judgments, and so you chose, I mean, you did do this for other crops, right? So we have two points. First of all, it would have been impossible for the agency to do this on the date of enactment, right? And that's important, because what the district court here said is that the provision was self-executing on the date of enactment. Well, that can't be right, because, again, I don't think the plaintiffs have ever disputed that the agency needed to do these calculations to make these policy decisions to do something. Well, you're right, and I don't want to step on your ability to fully answer Judge Carson, but on the first part of your answer, isn't your gripe then with Congress? Because the 1508G4 is either ambiguous or it's not ambiguous, and it seems alone, and I don't even think that you would necessarily quarrel with this too much, maybe a little bit in your briefs, but on it in itself, it seems awfully clear that Congress, maybe foolishly, said that this paragraph shall apply whenever, shall, which is an obligatory term, whenever the corporation, the FCSC, uses the actual production records, quote, for any of the 2001 and subsequent crop years. The 2015 winter wheat crop year fits within that. It applies when the actual production records are used, and so in itself, this provision seems to say, to express a congressional policy directive, maybe foolish, that if you're going to allow crop insurance for actual production history, if it's 2001 or after, you have to allow for the deletion of this exception. Yes, several responses. First of all, that provision is not part of the 2014 bill. That is a preexisting provision. Second point, that provision itself doesn't support the district court's judgment that the statute, that the 2014 statute was self-executing on the day of enactment. So the argument there is that even if the district court's wrong, we're correct about that, the agency should have done this later in time for the adjustment to be made for the 2015 crop year. With that set out, we believe that's not a reasonable way of reading that statute, because, again, when Congress enacted the 2014 amendments, it put the agency under an express deadline on a number of different provisions of the statute. Those provisions are set out at page 7 of our brief, and they are really extensive. They address a number of different requirements, and, again, the agency was not able to, the agency reasonably prioritized the provisions of the 2014 amendment that Congress told it it had to implement for that crop year, and that's the problem. I mean, did you timely develop data for other crops? I mean, not all crops that would be subject to this bill were excluded, right? Right. So my understanding is that, well, we did, first of all, so that's correct. So let me stop you there and ask you a question. I guess my concern is, and part of your position is, is that, hey, we had to make a judgment call. We couldn't do all crops at once. We had to make a judgment call and get the data for some of them. We couldn't get it for all of them. Is that right? Well, with an amendment to that, I think the real answer to your question is, my understanding is that the reason why they could do it for the other crops but not the winter wheat crop, it's because the winter wheat crop came earlier in the season. So the way this works, you know, it gets pushed out into 2015, depending on when the crops come in. So the winter wheat crop came at a time where the cutoff date was the earliest one. So, you know, they couldn't do it then, but as they make these policy decisions, the policy decisions are able to be made in time to provide the exclusion for the other crops, and that's why that came out the way it did. So by the September deadline for the winter wheat coverage, had the agency accomplished work for any crops? So my understanding was... Even the spring crops? I want to be careful. I'm not sure, but the record shows that the agency was not able to do that until December of 2014. Okay. But this is what I've... Yeah, and that's what I was trying to figure out is the significance of that December date. If that December date referred to the spring crops and the work that had been accomplished by that point, I thought it also indicated that by that time you also had enough data to address winter wheat. So I think that's correct. By December we would have, yes. So by December you had data for everything, all crops? We had it for winter wheat. I'm not sure about the other crops. Okay. And just so you know what my concern is, and maybe you can address it, is I think you've got a clear statutory directive, and your position is that the agency is going to get to use its judgment to pick the winners and losers, and I'm not sure that was delegated to you. So I understand that. I think our position is that the language is not clear because it was from a prior enactment, and that language there was put in there for a different purpose that actually supports us here. Congress put that language in there, the implementation date language for 2001, to extend, to give the agency more time to implement the changes that were enacted in 2001, and it served that purpose. That was the purpose for that, and now we're in a different situation, right, where Congress has laid upon the agency express implementation deadlines for the 2014 Act that prevent the agency from doing what otherwise it would have been required to do under the V.A. 4 provision. But we're told, we're to believe in the probably myth, but we're to believe that when Congress amends, adds, adjusts statutes, that they know what they're doing, and that they read the entire statute and understand the flow of the statute when read as a whole. So I don't know how we can ignore the fact that you have the 4A requirement on the books in front of Congress when they added the C-1 amendment. So I think it actually works the other way, Your Honor. I think the way the presumption works is when Congress amends a statute, that Congress is aware of the prior statute. But if Congress does something in the subsequent statute that makes it impossible for the agency to comply with the previous statute sort of read alone, the presumption is that Congress meant to abrogate that statute in part and follow the subsequent one. This came up in the Adkins decision from the Fifth Circuit, and the Fifth Circuit cited a Ninth Circuit opinion in support of its position was that, look, the agency has to do this retroactively, whatever. But if you look at that Ninth Circuit opinion, it supports what I'm telling you, because that was a situation where Congress had told an agency to issue an endangered species list ruling within a year of a notice. And what happened was Congress in between passed a moratorium on the use of funds for that expressed purpose. And the Ninth Circuit said, okay, well, you have a subsequent act by Congress. It's aware of what the previous requirement was, but it put a moratorium on that. So we have to say, well, we can't say that the agency had to comply with that previous statute where Congress was presumably aware of it and then put a moratorium on the use of funds. So I think that supports us. So is it your contention that the Fifth Circuit's case in Adkins improper or sort of misapplied the Ninth Circuit authority? Right. So the Fifth Circuit misapplied the Ninth Circuit authority. Right. And so you would urge us not to follow what the Fifth Circuit did, but to maybe go with your interpretation of the older Ninth Circuit case? Yes. Okay. I'd like to actually, I'm into my rebuttal time, but I want to make one other point because I think it's really important. The other thing that Adkins said is something that's not in the district court's opinion here, but it's worth knowing. The Fifth Circuit said that, again, however you look at this, because the agency has the numbers now, it has to provide the benefits retroactively, and it cited this Ninth Circuit case, which we say the court misinterpreted. But I want to make a point. This is very important. It's in the record. That wouldn't work here because this would expose the insurers to greater liability, potentially, than they agreed to when they not only issued the policies to these farmers, but also agreed to a reinsurance agreement with the government. So this is the situation. You can't put this back to where it was. This is going to harm the third-party interests of these insurers. So the Fifth Circuit is wrong. You can't just go back in the same way you could in the Ninth Circuit case. Maybe we're looking at a special bill, you know, to fix it. Right. That would be the remedy. Congress could look at this and say, yes. I'd like to reserve the rest of my time if I could. Thank you. Good morning, Your Honors, and thank you so much for having us. My name is Jeremiah Bittner. I'm an attorney in Oklahoma City, but I'm representing a group of farmers from southeastern Colorado in Baca County. In this case, FCIC is so anxious to get to step two of Chevron that, essentially, they skip right over the first step, which is, is the statute ambiguous, or more particularly, has Congress spoken directly to the issue at hand? In this case, every court that's looked at it has said yes. The Fifth Circuit had a really great section where they break down this applicability section, clause by clause, and they couldn't find out from these clauses, at what point does this not mean what it says it does? Let me ask you about one of the provisions, 1508G4D. In the case of a producer that makes an election under B or C, which this is, the corporation shall adjust the premium to reflect the risk associated with the adjustment made in the actual production history of the producer. Now, that would apply in this case, right? Absolutely. Now, so how would the FCIC, unless it had collected the information, be able to adjust the premium to reflect the enhanced risk without the data? Absolutely, and the calculation of the premium and the setting of the guarantee go hand in hand. There's no doubt that the agency would have to have that information in order to comply with its statutory directive. The problem was, and this goes into a bit of the sequencing that was talked about before, is that it just decided not to collect that information. The testimony by Mr. Schuse said that until October of 2014, they hadn't even started on this program. Okay, let's say the FCIC was deleterious. Now, they have an obligation to make the premium sufficient to cover the liabilities, the exposure, right? Sure. And they have an obligation, and the farmers have a corresponding duty to pay the enhanced premium to reflect this adjustment, right? That's correct. So why isn't there at least some plausible divergence of ways that you can read these provisions to say, on the one hand, Congress has spoken in G4A, I think, the provision that you rely on, and on the other hand, you have this other provision, and other provisions that are companion provisions, saying that the farmers are going to have to pay more premiums in light of this adjustment, and that can only take place if the FCIC collects this actuarial data. And so at least there is some divergence of ways that a reasonable person can read these. There's at least an ambiguity. I would respectfully disagree only in that we've got this provision saying, when you calculate actual production based on these records, you have to do it in this way. Well, the premium is a function of your actual production history, because the premium takes your guarantee and figures out what you need to pay. And so it's already baked into the APH exclusion, because once you exclude these years, your premium goes up because your guarantee goes up. So those two things work in concert anyway, and so it goes back to that applicability provision in the first place. Well, Congress must not have thought that that was sufficient in itself, because they added on top of that provision this specific provision that said the FCIC shall adjust the premium, right? And so Congress obviously was expressly contemplating that there is going to be something on top of what it said in G4A, I think, to say that there is going to be some additional premium that the farmers have to pay. Now, how can you do that? How can you comply with that G4D if the actual actuarial data doesn't exist, that corresponds to this adjustment for the exclusion of the low-producing crop year? Absolutely. And I think what I would say is you can't do either one of these if the agency doesn't have the data. And so you can't honor the APH exclusion provision, and you can't adjust the premium. But that said, that doesn't take away the obligation that is on the agency to go out and make both of these statutes effective as of the date of enactment. And that goes back to whether or not G4A is ambiguous. And so if the question is are there textual clues that make it ambiguous, well, there is no conflict between G4A and the provision that you were citing based on it. It only may become ambiguous when you bring in this extrinsic evidence. And all the courts that have looked at this say we don't get to extrinsic evidence because the text itself is unambiguous. Well, why doesn't it at least create a plausible alternative that the verb apply might mean something different than implement? Because your adversary's argument is that, well, these are textually different. And you're saying, well, they're reconcilable. But the counter to your position is, well, that assumes that Congress, when it said apply, meant that it will be implemented at a particular date. And that's not necessarily true. You could say that the verb apply means something different than implement because 150G4, 1508G4A is not self-implementing. The argument for the fact that apply doesn't mean implementation certainly has been looked at. The Fifth Circuit believed that it did. The magistrate judge said there's no reason to believe, especially within the context of this particular statute, that it is anything other than a direction to the agency saying you need to do this. But let's say that it doesn't mean implement. Well, if that's the case, the default rule is it's still immediately effective. And you can look at, that's the Gosling case, but it's also the Huberman case, which they cited. They looked at the Food Stamp Act amendments of 1985, which was very similar to the changes made in the calculation methodology of this case. And they looked back at previous laws in the Food Stamp Act, and previously Congress had said this is effective, but it will be implemented basically at the secretary's discretion, understanding the need for orderly implementation. And the Huberman case, which again they cited, looked at that and they said, well, you know, they didn't use the word implement here, so we go back to that default rule. I mean, they had used it before. They don't use it here. Therefore, we think it was immediately effective and immediately available. So I'd encourage attention to be made to that case. Is the government's position here that it was a staff problem or it was an overburdensome problem that Congress put a duty on them that they physically couldn't comply with? That's right. They certainly play up this impossibility argument quite a bit, and they do it for a few different reasons. But first of all, I don't think the record shows that it was impossible. The record shows they didn't start on APH until October, and yet they were able to have winter wheat figured out by December. That's only two months. Congress passed the law in January of 2014. It was signed into law in February. So they had seven months before the sales closing date. They could have done it in two. And second of all, they said, well, Congress knew how hard this was going to be, and that means that they didn't intend for it to be immediately available. Well, if you look at that conference report, Congress knew that this was going to be difficult, and that's why it said we gave you additional resources. I think this is in Chairman Conway's speech. He says that we gave you additional resources so that you could get this going by 2015. We can't consider that, can we, because it was post-adoption. I'm sorry? Justice Scalia, writing for the court, said that we can't consider post-enactment legislative history, so we can't consider that, can we? Well, only in that we can consider the fact that Congress did appropriate additional funds because it understood that there were going to be challenges. But the explanation for that we can't consider. That's correct. But it doesn't hold up to say Congress thought this was going to be impossible, therefore they must not have intended to be immediately available for the 2015 winter reef farmers. They also talked about these other implementation deadlines for the other farm bill programs. What's interesting is that none of them include the word implement either. In fact, their instructions are very similar to the one in G4A. They say, agency, you shall do this, or you shall make this available. It doesn't include any sort of specific implementation language. So when they say, well, we had to get these because these had implementation language, that's just not true. Well, I'm not sure. My question really could be directed at either side because both of you spend quite a bit of energy and pages disputing this of whether they could have prioritized the crops differently. But I don't understand what that has to do with at least this Chevron issue. Now, it may have something to do with your argument that they took too long. My question to you about that is, did you present that in your blue brief? I mean, did you present that in district court? In district court, and I don't think you did, did you? No, and this is not an unreasonable delay case. That's correct. And so if it's not an unreasonable delay case, then what does it matter if they could have done this? It goes only to their argument because they say the impossibility is extrinsic evidence to create an ambiguity in the text. And so I agree. I don't think we ever get to evidence of impossibility because the text is unambiguous. But the other judges have said, well, let's at least take a look, and every one of them has said this is either unconvincing or, in fact, favors the farmers. And so I agree. I'm only disputing what their claims are about impossibility. I'm not saying it has any relevance because we have an unambiguous statute. We don't need these extrinsic cases. Okay. And counsel touched on this a little bit, but basically, and Fifth Circuit said this as well, that their argument, their interpretation, they say that there's this ambiguity and this is the interpretation that you follow. Well, it robs G4A of any meaning at all, and they've never been able to say in 2018, what does that provision mean? Because all they can say is it doesn't mean anything to us anymore. It's superfluous, which, if we're going to get into statutory interpretation, everyone knows that we're not supposed to adopt an interpretation that makes a provision like that superfluous. So I don't think they've ever been clear as far as what the practical effect on that is. And then even if we get to step – oh, I'm sorry. No, go ahead. Even if we get to step two in Chevron, it's an important note and it's been pointed out and it was pointed out in the Huberman case as well that certainly they're going to claim that they're entitled to all this deference. But the authorities don't really support that for purposes of this, because whether or not it's immediately available is not within the expertise of the agency, which is the whole public policy reason why we have this deference anyway. And so that was specifically stated in the Huberman case. Is there another case besides the Fifth Circuit's decision and the district court's decision in this case that has addressed this? No. The only courts that have addressed it were the Northern District of Texas, which then was affirmed by the Fifth Circuit and the District of Colorado. There are two other cases percolating right now in the District of Oklahoma and the District of Kansas, but we have not received a district judge ruling on those cases. What's their status? It's been fully briefed and I think they might be keeping an eye on today. Summary judgments on both? Yes. It was a briefing schedule for a judicial review. So it was not approached as summary judgment, but rather just this is the briefing for the judicial review determination. Okay. And that briefing has been completed? It's been completed for well over a year. Under advisement both? Correct. Okay. Thank you. Unless there are any other questions, I'll see the rest of my time. Thank you all. Thank you. Thank you. So with respect to the other statute, the other parts of the 2014 bill that I've said that the agency prioritized because they had express dates, implementation dates. My friend says that the statute didn't say implementation. I would just direct the court to footnote three of our briefs on page seven. I'll just quote you one of them. Section 1508C6D1, directing the CIC to offer price selections for certain organic groups, quote, as soon as possible but not later than the 2015 reinsurance year. That's pretty clear. And then there are several of these. These clearly say that they provided implementation dates for those. There are four provisions listed there. Let me ask you about that. So those provided specific implementation dates that were all after the effective date of the bill itself. They all applied to the 2015 crop year, which is the same issue that we have here. That's what it's all about. I understand, but I mean, I guess the argument could be made that if it doesn't speak to it at all, it's immediately effective, but that they can change it by providing a different effective date. So I think actually, respectfully, the flip side is the way to look at it, and that is where Congress in a statute several times provides express implementation dates and then in another provision doesn't do that. The presumption is that Congress didn't mean for there to be an implementation, but leave that to the agency's reasonable judgment. I have a couple other points, but I'm over time if you'd like. Any other questions? I don't have any. Thank you. Thank you. Thank you both for your arguments. The case is submitted. We'll take a 10-minute recess at this time. When we return, we'll hear arguments in Herrera versus United Airlines.